1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
9                          AT TACOMA

10

11  DELIA OGDEN,

12                  Plaintiff,                    Case No.  C09-5523RJB

13            v.                                  ORDER ON FEDERAL
                                                  DEFENDANT'S MOTION FOR
14  THOMAS VILSACK, Secretary, U.S.               SUMMARY JUDGMENT
    Department of Agriculture,
15
                    Defendant.
16

17

18          This matter comes before the court on the Federal Defendant's Motion for Summary

19  Judgment.  Dkt. 14.  The court has considered the pleadings filed in support of and in opposition to

20  the motion and the file herein.

21                              RELEVANT FACTS

22          Starting in 2000, plaintiff Delia Ogden was a food inspector for the U.S. Department of

23  Agriculture (USDA), Food Safety and Inspection Service (FSIS), assigned to the Foster Farms

24  poultry plant in Kelso, Washington. As a line inspector, her responsibilities included inspecting

25  slaughtered chickens on-site to verify that they were fit for human consumption. Dkt. 14-3, at 3.

26  Federal regulations and (FSIS) directives dictate that food inspectors must work during all hours that

27  a slaughtering plant is in operation slaughtering chickens. *See* 9 C.F.R. §§ 307.4 and 381.37; and

28  FSIS Directive 2,600.2 (Dkt. 14-3, at 9-13); *see also* Dkt. 14-3, at 3.  FSIS Directive 2,600.2 states in

relevant part that "FSIS is to provide overtime inspection coverage to an establishment during the entire time that the establishment conducts activities that require inspection coverage. ..." Dkt. 14-3, at 10.; *see also* Dkt. 14-5, at 4.

Foster Farms operates during two shifts. Both shifts sometimes have overtime, with the first shift sometimes coming in early, and the second, or swing, shift sometimes working late. Saturday overtime is required as well. Dkt. 14-3, at 3; 14-5, at 3; 14-9, at 15. In 2008 Foster Farms was in operation on 23 of 52 Saturdays. Dkt. 14-3, at 3. In 2009, Foster Farms was in operation on 19 of 52 Saturdays. Dkt. 14-3, at 3.

The general vacancy announcement used in 2000, at the time plaintiff was hired by FSIS for the FSIS inspector position states that: "Depending upon the work requirements at your assigned facility, you may be required to work some overtime or on some Federal holidays." Dkt. 14-6, at 3 and 5; 14-5, at 4 and 6. That provision in the vacancy announcement has remained unchanged to the present date.  However, the position description for "Food Inspector (Slaughter)", GS-863-07, sets forth the duties of the position, but the description does not include a provision related to overtime or shift work. Dkt. 16-7, at 42-44.

At her pre-employment medical examination before she started work as an FSIS food inspector, plaintiff signed a "Certificate of Medical Examination" that listed "Protracted or Irregular Hours of Work under Position Requirements...Environmental Factors." Dkt. 14-9, at 25-27; 14-10, at 2.

The Labor Management Agreement covering FSIS employees at the Foster Farms plant provides that overtime is the "responsibility of the employee covering the assignment." Dkt. 14-3, at 6 and 18.  The Labor Management Agreement further provides as follows:

> Employees willing to work voluntary overtime may post their name on a roster for that purpose. These rosters may then be used to assist employees who wish to obtain a qualified replacement for overtime work.  Replacement is subject to the approval of the supervisor and is to be at no additional cost to the Agency.

Dkt. 14-3, at 18.

In April of 2005, the Denver District of the FSIS, the headquarters for District 15, instituted a shift rotation throughout the District, and food inspectors started rotating shifts instead of working only one shift all of the time. Dkt. 14-3, at 3 and 14-4, at 2.  Plaintiff's duty station in Kelso was part

of District 15.  When the rotation schedule was announced, Boulder District Manager Dr. Ron Jones

sent a memorandum to "All Employees", informing them as follows:

> If you have a medical condition that could prevent you from participate in the rotation pattern, you must submit a request for medical accommodation.  Please review FSIS Directive 4306.11, Employment of Persons With Disabilities, Part Two–Reasonable Accommodation. You will need to submit the required documentation requesting a medical accommodation by March 7, 2005.  If you have already submitted your request for accommodation that determination still stands.

Dkt. 16-2, at 57.

In January of 2008, plaintiff informed her supervisors that she had been diagnosed with

multiple sclerosis and could no longer work overtime. She requested an accommodation reflecting

her doctor's instructions that she could only work a forty-hour week, no overtime, and only first shift.

Dkt. 14-9, at 28; 14-11, at 2; 14-3, at 3.

On January 11, 2008, Sherry Dejarlais, Ms. Ogden's first line supervisor at the Foster Farms

plant, changed plaintiff's hours of work to comply with her request for about two months.  Dkt. 14-3,

at 4; 14-5, at 3-4.

However, in February, 2008, USDA personnel at the District Office in Denver advised Dr.

Myra Barros, Ms. Ogden's third line supervisor, that reasonable accommodation decisions were not

made by FSIS personnel at the plant level. Dkt. 14-5, at 3-4.  District Manager Dr. Ron Nelson stated

in an affidavit, as follows:

> While well-intentioned, Ms. DeJarlais' *ad hoc* effort was unfair to other employees who also might want to work only first shift and no overtime, thus creating morale problems, and her effort potentially ran afoul of the collective bargaining agreement with the employees, which made overtime the responsibility of the employee and which had clear rules in place for "trading" shift rotations or obtaining overtime coverage.  Further, I recall that there were other employees at the Foster Farms plant with medical issues during this time, and it was imperative that all accommodation decisions be made by the Human Resources Department in Minneapolis, not be first line supervisors.  This *ad hoc* solution also created logistical problems at the plant and was increasing employees' work load.  The plant was experiencing difficulty covering shifts during early 2008.  At that time we had one inspector who was out on extended sick leave, so the position technically was not vacant; however, later on the position became vacant along with two other positions.  The problem was not only did the plant have one inspector already out on extended sick leave, it also had an individual who had received a promotion.  Thus, he was performing his requisite Food Safety Regulatory Enforcement training.  The plant also had an employee who had to be removed for disciplinary reasons, so his position had to be filled as well.

Dkt. 14-5, at 3-4.

Dr. Barros stated in her affidavit that, on February 21, 2008, in accord with her instructions

from the District Office, she informed Ms. Ogden and Ms. Dejarlais that Human Resources would address Ms. Ogden's accommodation request and that the scheduling changes that Ms. Derjarlais had made were cancelled pending resolution of Ms. Ogden's request for accommodation. Dkt. 14-3, at 4. Ms. Ogden decided to take leave at this time while Human Resources considered her request for reasonable accommodation. Dkt. 14-3, at 4.

Human Resources Specialist Shannon Montgomery of the FSIS District Office in Minneapolis responded to plaintiff's accommodation request and worked with her to determine whether reasonable accommodation was possible. Dkt. 14-7 and 14-8.  Ms. Montgomery requested and reviewed information provided by Ms. Ogden's doctors, Dr. Wilson and Dr. Nilaver. Dkt. 14-7. These physicians reiterated that due to Ms. Ogden's multiple sclerosis, she was restricted to working a forty-hour week, no overtime, and first shift only. Dkt. 14-6, at 6-14. The doctors advised that Ms. Ogden's condition would not improve, was chronic, and would deteriorate more rapidly without the restrictions. Dkt. 14-6, at 6-14. The doctors confirmed that Ms. Ogden could not work in her current position without the restrictions. Dkt. 14-6, at 6-14.  Dr. Wilson confirmed that the restrictions were permanent. Dkt. 14-6, at 13-14.

Ms. Montgomery conferred with USDA Reasonable Accommodation Advisor Thomas Valluzzi, worked at USDA headquarters in Washington, D.C. Dkt. 14-7, at 3; and 14-8, and 2-4.  Mr. Valluzzi stated in his affidavit as follows:

> I was not familiar with mandatory overtime's ramifications for reasonable accommodation, so my question to EEOC was how does mandatory overtime fit in with reasonable accommodations and essential functions of the job, and is mandatory overtime an essential function of the job under the ADA.  After speaking with FSIS personnel we had determined that mandatory overtime was an essential job function, and I shared this with the EEOC.  My primary, but not sole, contact at the EEOC was Sharon Rennert.  The EEOC advised that mandatory overtime is an essential job function.

Dkt. 14-8, at 3.

Mr. Valluzzi stated in his affidavit that, after discussing plaintiff's medical restrictions and doctors' letters with FSIS Human Resources personnel in Minneapolis, he determined that they should try to accommodate plaintiff.  Dkt. 14-8, at 3.  Thereafter they gathered information from personnel at the District and plant level in order for the USDA to determine whether reasonable accommodation for Ms. Ogden was possible. Dkt. 14-4, at 2-4; 14-5, at 2-5; 14-3, at 4-6.

Dr. Barros, Ann Layman (Resource Management Analyst at the District Office), Ms. Montgomery, Mr. Valluzzi, Dr. James Adams (Deputy District Manager), and Dr. Ron Nelson (District Manager) explored whether the agency could accommodate plaintiff at her duty location, by offering her a forty-hour week, first shift only, at Foster Farms. Dkt. 14-3, at 4; 14-4, at 2-6; 14-7, at 3; 14-8, at 3-4.

The USDA determined that requiring others to work Ms. Ogden's "overtime for the rest of her career was not reasonable and placed an undue burden on ... [FSIS] operations." Dkt. 14-3, at 4-6; 14-4, at 3. Several options were considered, including use of "inspectors on patrol," intermittent employees, and relief inspectors.

FSIS personnel specifically investigated use of "inspectors on patrol" to work Ms. Ogden's overtime in her place at Foster Farms. Dkt. 14-3, at 4-5; 14-8, at 3-4; 14-7, at 3. The so-called "roving inspector" is a Consumer Safety Inspector, and not a Food Inspector, who travels an assigned area to inspect at designated plants where Consumer Safety Inspectors do not have to be on-site all the time. These inspectors work overtime of their own. Dkt. 14-3, at 4-5. After investigation FSIS concluded that use of an inspector on patrol to cover plaintiff's overtime at Foster Farms was not feasible. During the relevant period no such inspector was located within commuting distance of the Foster Farms plant in Kelso. Further, these inspectors were subject to overtime requirements at the plants on their circuit, and may not always be available to cover for plaintiff. Dr. Barros stated in her affidavit, "In short, 'inspectors on patrol' do not generally cover for line [food] inspectors who are on leave, but rather provide inspection services at processing ... facilities where inspectors are not on-site at all times..." Dkt. 14-3, at 4-5. *See also* 14-8, at 3-4.

FSIS personnel also investigated whether plaintiff's requested accommodation could be implemented by use of "intermittent employees" to work plaintiff's overtime at Foster Farms. Dkt. 14-3, at 5. Intermittent employees are part time employees who are called to cover any line inspector vacancy at plants within the employee's commuting distance. FSIS personnel determined that there was an insufficient number of these employees to assign an intermittent employee to cover plaintiff's overtime. Dkt. 14-3, at 5. Moreover, for long-term planning purposes, FSIS personnel concluded that it was not feasible or realistic to expect that an intermittent employee could cover for plaintiff for the

rest of her career for the following reasons: an intermittent employee does not have to accept an assignment when contacted; an intermittent employee could not and might not always be available, due to personal commitments or conflicts or because the intermittent employee might already be working in a position covering another employee on leave or a vacant position; an intermittent employee is a part-time employee, and the person holding this position is limited to working a certain number of hours. Dkt. 14-3, at 5.

FSIS personnel determined that use of "relief inspectors" was also not a feasible long-term or permanent response to plaintiff's request for permanent exemption from overtime work at Foster Farms for the following reasons: a limited number of relief inspectors were available to cover every vacancy within the District, which encompassed several states; and vacancies occur for a multitude of reasons, for example, a position is unfilled, an employee is on vacation, an employee is on sick leave, or an employee may be attending training. Dkt. 14-4, at 3; 14-3, at 5-6.  Ms. Layman and Dr. Barros stated in their affidavits that the Foster Farms plant and plants throughout the District were experiencing a high number of vacancies at this time, and there were not enough relief employees to cover all the vacancies. Dkt. 14-4, at 3; 14-3, at 5-6. Dr. Barros stated that there was no guarantee that a relief inspector could always cover plaintiff's overtime.  Dkt. 14-3, at 5-6. Moreover, FSIS personnel determined that requiring the USDA to assign a relief inspector on a permanent basis to work Ms. Ogden's overtime meant that a vacancy elsewhere went unfilled, and, according to Ms. Layman, the USDA lost the flexibility and discretion it needed "to staff open positions within the District as it deems necessary." Dkt. 14-4, at 3.

Plaintiff testified in her deposition that Hans Yngve, who worked the opposite shift from plaintiff told her that he would be willing to work swing shift instead of rotating shifts, and that she understood that he would be willing to do this permanently.  Dkt. 16-2, at 8, and 24-25.  Mr. Yngve stated in an affidavit that he may have agreed to trade shifts on a temporary basis, but that he never agreed that any trade would be permanent.  Dkt. 14-12, at 2.  Plaintiff also testified that she would be willing to work Tuesday through Saturday, or take Friday off and work Saturday.  Dkt. 16-2, at 11-12.  Plaintiff also testified in her deposition that Sandy Kana told the employees at the Kelso plant that she would be willing to work Saturdays if they needed help.  Dkt. 16-2, at 23 -24.

1    Robert Green, a consumer safety inspector with the USDA and a union representative at the

2    time of the events at issue in this case, stated in his declaration that, over the years, there has been a

3    fluctuation in the need for Saturday overtime, depending on the production schedule at the Kelso

4    plant; that the USDA kept a voluntary list and a mandatory list for overtime, so that overtime would

5    always be covered; that the plant has often had vacant assignments because positions have seldom

6    been filled completely; another line inspector volunteered to remain on nights so that plaintiff could

7    stay on the day shift; there have been times when people traded shifts as long as it was agreeable to

8    both parties and approved by supervisory staff; that the labor management agreement did not prohibit

9    plaintiff from having as Tuesday through Saturday schedule; that other consumer safety inspectors

10    can over the Kelso plant when needed; and that intermittent employees could provide coverage if

11    someone called in sick or was on vacation.  Dkt. 16-7, at 47-49.  Mr. Green stated that "[t]he Agency

12    could have easily accommodated Ms. Ogden.  They could have been more flexible about adjusting

13    the schedules, particularly in light of the vacant assignment."  Dkt. 16-7.

14    FSIS personnel searched for another slaughtering plant within plaintiff's commuting area or

15    even within the District that had only one shift and did not require overtime, and then broadened the

16    search to include all plants nationwide. Dkt. 14-7, at 3-4; 14-8, at 4-5; 14-4, at 4; 14-3, at 7.  The only

17    facility the FSIS personnel could find that met plaintiff's restrictions was located in New York state.

18    Dkt. 14-3, at 7.  In May of 2008, the USDA formally offered plaintiff a transfer to the facility in New

19    York and offered to pay her moving expenses. Dkt. 14-7, at 3-4 and 22; 14-8, at 4-5; 14-3, at 7. The

20    USDA also offered plaintiff a part time position, an intermittent position, at Foster Farms, explaining

21    the impact on her benefits and advising that she could work up to forty hours per week, if needed.

22    Dkt. 14-7, at 3 and 22. Plaintiff was also given the option of seeking a disability retirement.  Plaintiff

23    testified in her deposition that she did not want to move to New York because she would be away

24    from her physicians and family, and that a part time position would impact the amount she would

25    have to pay for her health insurance. Dkt. 16-2, at 10-11.

26    Plaintiff declined the USDA's accommodation of a paid transfer to the facility in New

27    York and declined the USDA's accommodation of a part time position at the Foster Farm plant.

28    Instead, she elected to seek a disability retirement.  Dkt. 14-7, at 4; 14-8, at 4-5; 14-3, at 7. Plaintiff's

1    retirement was effective August 30, 2008. Dkt. 14-7, at 4.

2         On August 27, 2009, plaintiff filed a complaint for declaratory, injunctive and monetary relief

3    to redress deprivation of her rights under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. Dkt.

4    1.  Plaintiff alleges that FSIS denied her request for reasonable accommodation after she was

5    diagnosed with multiple sclerosis.

6                            MOTION FOR SUMMARY JUDGMENT

7         On June 15, 2010, defendant filed a motion for summary judgment, arguing that (1) plaintiff

8    is not a qualified individual with a disability because she cannot show that she can perform an

9    essential function of her job, which is that she work overtime; and (2) the accommodation that

10   plaintiff requested was not reasonable.   Dkt. 14.

11        On July 6, 2010, plaintiff filed a response opposing the motion for summary judgment,

12   contending that (1) plaintiff was qualified to perform the essential functions of the food inspector

13   position because overtime was not an essential function of the job; (2) Ms. Dejarlais' action in

14   complying with plaintiff's request for day shift only, no overtime, was a reasonable accommodation;

15   (3) the USDA failed to engage in good faith in the interactive process; (4) the USDA failed to

16   establish as a matter of law that relieving plaintiff from overtime would cause undue hardship; and

17   (5) the alternative accommodations offered by the USDA were unreasonable.  Dkt. 15.

18        On July 11, 2010, defendant filed a reply, maintaining that plaintiff is not a qualified

19   individual because overtime is an essential function of the job and that the accommodation plaintiff

20   requested was not reasonable.  Dkt. 17.  Defendant contends that FSIS supervisors could require an

21   employee to work overtime; the general vacancy announcement and Certificate of Medical

22   Examination state that overtime, or protracted or irregular hours, may be required for the position;

23   that USDA regulations require that food inspectors work during all hours that the slaughtering plant

24   is in operation; that coverage by intermittent employees or supervisors is intended for temporary

25   issues, not for permanent coverage; and that the accommodation plaintiff requested would please a

26   tremendous hardship on the plant.  Dkt. 17.

27                            SUMMARY JUDGMENT STANDARD

28        Summary judgment is proper only if the pleadings, the discovery and disclosure materials on

ORDER
Page - 8

1   file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

2   is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is entitled to

3   judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an

4   essential element of a claim in the case on which the nonmoving party has the burden of proof.

5   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where

6   the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.

7   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must

8   present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also*

9   Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient

10  evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

11  versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service*

12  *Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

13          The determination of the existence of a material fact is often a close question.  The court must

14  consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

15  preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service*

16  *Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the

17  nonmoving party only when the facts specifically attested by that party contradict facts specifically

18  attested by the moving party.  The nonmoving party may not merely state that it will discredit the

19  moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the

20  claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.  Conclusory, non

21  specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan*

22  *v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

23                                       DISCUSSION

24      **1.  Statutory Scheme of the Rehabilitation Act**

25          The Rehabilitation Act prohibits employment discrimination on the basis of disability. 29

26  U.S.C. § 791 *et seq*. To state a *prima facie* case under the Rehabilitation Act (RA), a plaintiff must

27  demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment,

28  and (3) suffered discrimination because of her disability.  *Walton v. U.S. Marshals Service*, 492 F.3d

1  998, 1005 (9th Cir. 2007).

2       The Rehabilitation Act defines an "individual with a disability" as one who (1) has a physical

3  or mental impairment that substantially limits one or more major life activities; (2) has a record of

4  such an impairment; or (3) is regarded as having such an impairment by the person's employer.  29

5  U.S.C. § 705(20)(B).  The Ninth Circuit looks to the standards applied under the Americans with

6  Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 121 1 *et seq*., to determine whether a violation of the

7  Rehabilitation Act occurs in the employment context.  29 U.S.C. § 794(d); *Coons v. Secretary of the*

8  *U.S. Dept. of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).

9       To be substantially limited in performing manual tasks, so as to be "disabled" under the ADA,

10  an individual "must have an impairment that prevents or severely restricts the individual from doing

11  activities that are of central importance to most people's daily lives."  *Toyota Motor Mfg., Ky., Inc. v.*

12  *Williams*, 534 U.S. 184, 198 (2002).

13       Under the ADA, a "qualified individual with a disability" is:

14       an individual with a disability who satisfies the requisite skill, experience, education and
         other job-related requirements of the employment position such individual holds or desires,
15       and who, with or without reasonable accommodation, can perform the essential functions of
         such position.

16  29 C.F.R. § 1630.2(m) (2008);  42 U.S.C. § 12111(8).

17       A job's "essential functions" are "fundamental job duties of the employment position. . ., not

18  includ[ing] the marginal functions of the position."  29 C.F.R. § 1630.2(n)(l).  If a disabled person

19  cannot perform a job's "essential functions," even with a reasonable accommodation, then the ADA

20  employment protections do not apply.  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 989 (9th

21  Cir. 2007).

22       When a plaintiff alleges a failure to accommodate a disability under the Rehabilitation Act,

23  the burden is on the plaintiff to prove that she or he is a qualified individual with a disability.

24  *Buckingham v. U.S.*, 998 F.2d 735, 739-40 (9th Cir.1993). The court must first examine whether the

25  individual can perform the essential functions of the employment position that such individual holds

26  or desires.  42 U.S.C. § 12111(8).   The court must determine whether an individual satisfies the

27  "requisite skill, experience, education and other job-related requirements" of the position. 29 C.F.R.

28  § 1630.2(m).  Then if accommodation of the plaintiff as a qualified individual with a disability is

required to enable the plaintiff to perform the essential functions of the job, the plaintiff must provide evidence sufficient to make at least a facial showing that reasonable accommodation is possible. *Buckingham v. U.S.*, 998 F.2d at 740. If in response to the plaintiff's evidence that reasonable accommodation can be made, the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff bears the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made. *Sisson v. Helms*, 751 F.2d 991, 993 (9th Cir.1985).

### 2. Job-related Requirements/Essential Function of the Job

Defendant argues that plaintiff's Rehabilitation Act claim must be dismissed because there is no evidence that at the time of the acts complained of, plaintiff was (1) an 'individual with a disability' or (2) a 'qualified individual.' Dkt. 36-2 at 4.

Defendant maintains that plaintiff has not met her burden to establish a *prima facie case* for violation of the RA because she cannot show that she can perform the essential function of the job of line inspector.  Defendant contends that overtime work is an essential function of the job.

It is undisputed that plaintiff is an individual with a disability, multiple sclerosis, that prevents her from working more than forty hours a week, day shift only (although plaintiff stated in a deposition that she might have been able to work overtime if she had been permitted to work day shift. *See* Dkt. 16-2, at 33).  The issue is whether plaintiff is a *qualified* person with a disability. Plaintiff must meet her burden to show that she has the requisite skill, experience, education and other job-related requirements of line inspector at the Kelso plant, and, if so, that she make a facial showing that reasonable accommodation is possible.

Federal regulations require the presence of FSIS inspectors when slaughtering plants are in operation. *See* 9 C.F.R. §§ 307.4 & 381.37. The vacancy announcement for Ms. Ogden's position stated that overtime was required, depending on the requirements of the plant.  The Foster Farms plant operates two shifts, with overtime.  FSIS inspectors at Foster Farms, including plaintiff, work significant overtime. The Certificate of Medical Examination, signed by plaintiff during the application process, expressly listed "protracted or irregular hours of work" as a position requirement.  However, the Food Inspector (Slaughter), GS-1863-07, position does not include a

provision identifying overtime or irregular hours one of the duties of the position.

It is significant that, when the rotating shift schedule was put in place in 2005, employees were informed that they could request reasonable accommodation. In addition, the USDA offered plaintiff some alternatives as reasonable accommodation, although not at the Kelso plant.

There are issues of fact as to whether overtime and irregular hours were an essential function of the job of food inspector.

### 2. Reasonable Accommodation

To prevail on her Rehabilitation Act claim, plaintiff bears the burden of showing that reasonable accommodation would have enabled her to perform the essential functions of her position.

Once an employee has requested reasonable accommodation, an employer must take affirmative steps to engage in an informal interactive process to clarify what the employee needs and to identify the appropriate reasonable accommodation. *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1114-15 (9th Cir. 2001), *rev'd on other grounds*, 535 U.S. 391 (2002).

Defendant contends that the USDA engaged in the interactive process with plaintiff and attempted to offer her accommodation, even though she was unable to work overtime or protracted or irregular hours.  Plaintiff contends that the interactive process was not in good faith.  There are issues of fact as to whether the USDA engaged in the interactive process in good faith.

An employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation. *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002); *Elkins v. North Seattle Community College*, 2009 WL 3698516 at *3 (W.D. Wash. Nov. 3, 2009); *Nelson v. Snow*, 2006 WL 828763 at *5 (W.D. Wash. March 27, 2006).

Defendant contends that complying with plaintiff's request for a forty hour week, day shift only, schedule would have created logistical problems at the plant and would have increased the employees' work load at the plant; that covering plaintiff's overtime and swing shift on a permanent basis would have created an undue burden on the plant; and that the accommodation plaintiff requested would have been unworkable at the plant. There are issues of fact, however, as to whether plaintiff's request for accommodation was reasonable, and would have been workable. *See* Mr.

1    Green's statement that the agency could have been more flexible about adjusting the schedules,

2    particularly in light of the vacant assignment.

3        There are also issues of fact as to whether the options offered by the USDA (transfer to New

4    York, part time employment, or disability retirement) were sufficient to constitute reasonable

5    accommodation.

6    **4. Conclusion**

7        Plaintiff has shown that there are issues of fact as to whether she is a qualified individual with

8    a disability and whether the USDA met the requirements for reasonable accommodation under the

9    Rehabilitation Act.  Defendant's motion for summary judgment should be denied.

10       Therefore, it is hereby

11       **ORDERED** that the Federal Defendant's Motion for Summary Judgment (Dkt. 14) is

12   **DENIED**.

13       The Clerk is directed to send uncertified copies of this Order to all counsel of record and to

14   any party appearing *pro se* at said party's last known address.

15       DATED this 21st day of July,  2010.

16

17

18   Robert J. Bryan
     United States District Judge

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 13